## J. T. SHELL v. THE STATE.

*No. 353.   Decided January 17.*

**1. Theft—Newly Discovered Evidence—New Trial.**—On a trial for horse theft, where one of the grounds for new trial was to obtain the testimony of defendant's father and mother as to certain statements made by defendant to them concerning the horse, and which statements defendant swore he did not remember at the time he went into the trial, *held,* that the testimony was not newly discovered, and that the new trial was properly refused.

**2. Charge of Court not Excepted to — Practice on Appeal.** — Where the charge of the court complained of for error was not excepted to, the question on appeal is, was it calculated, when the whole charge and evidence are considered, to injure appellant? If not, the error is not reversible.

**3. Same.**—On a trial for horse theft, where it appeared that defendant obtained possession of the animal from the father of the owner, and the defense was an agreement with the owner about getting the horse, *held,* the court properly instructed the jury, in effect, that if accused got possession of the horse in pursuance of and with intent to comply with the agreement with the owner, he would not be guilty, but if he obtained him from the father of the owner with intention to appropriate him at all events, whether he complied with his agreement with the owner or not, he would be guilty.

APPEAL from the District Court of Tarrant.   Tried below before Hon. S. P. GREENE.

The indictment charges appellant with theft of a horse, the property of one W. C. Freese.   He was convicted at the trial, with punishment assessed at five years imprisonment in the penitentiary.   In order to illustrate the character of the principal features of the case, it is necessary to give portions of the testimony.

W. C. Freese testified, for the State:   I know the defendant.   I first saw him on Weatherford Street, in Fort Worth, about the 1st of November, 1892.   He came up to me and asked if my name was not Freese, and if I was not the father of Marsh Freese.   I said, Yes.   He told me that he knew from the description Marsh had given him of me.   He then told me that Marsh Freese had sent him to me to get a horse, a six shooter, and some money.   That Marsh had cut out of jail, and wanted them to make his escape; told me that it would only take about three hours to get out.   That he was to take the horse to an old negro graveyard about one mile from Gainesville, and Marsh was to meet him there and get them.   I took him home with me, and I sent to Bob Young to know if defendant was all right.   Bob Young said that he had seen the defendant in jail at Gainesville with Marsh Freese, my son.   Defendant gave me a note purporting to be from Marsh Freese, saying that defendant was all right; but Bob Young then spoke up, saying, "That is not Marsh's handwriting."   He told me that Marsh told him to get a horse called "Old Bob," if he could, and if he could not get Old Bob, to send

the heart horse. I told him that the Hargrove boys claimed Old Bob somehow, and I could not get him, and I would have to send Old Heart. I went and got the heart horse, and turned him, Marsh's saddle, a six shooter, and $10 in money over to defendant. I thought when I did so that I was sending them to my son, Marsh Freese, and would not have let defendant have them if I had not thought so, from what the defendant told me. The horse was sorrel, 15½ hands, and branded with a heart with a bar through it.

The next time I saw defendant was about ten days after, when he came back to my house; stated that they had put a guard at the jail and that he had bought the guard. Said he first offered him $25, and he refused it. Then offered him $50, which he refused; he then offered him $26, and he accepted it; and that he had given Marsh $12. That he had got some money from an estate. I then gave him $22; told him that was all I had, and that I had let him have $10 before, and that I owed him about $15 yet. I let the defendant have the horse in Tarrant County, Texas. I afterwards got the saddle from a Mr. Scott, at St. Joe, Texas.

On cross-examination: My son, Marsh Freese, went to the penitentiary for ten years from Granbury. I was anxious for him to escape. It was my purpose to facilitate his escape. I would have furnished money for him to escape, but I would not have furnished him arms to kill an officer with. I did not know what he wanted with a six shooter. I sent him the six shooter because he wanted it. It was Marsh's horse that I let defendant have, and Marsh's saddle, but they had been in my possession since Marsh was put in jail.

Re-examined: The second time defendant came to me, when I gave him the $22 in money, in addition to what I have already stated that he told me, he said that the horse which I had sent by him was up there tied in a stable, and that Marsh knew just where to get him.

Jack Watson testified, for the State: I keep a wagon yard at St. Joe, Montague County, Texas. The 11th of November, 1892, the defendant came to my place with a horse, which he offered to sell. I traded for the horse, and disposed of him immediately to H. M. Scott. Afterwards I suspicioned that all was not well, and I hunted the defendant up, and asked him where he got the horse, and he said, "I got him by sleight of hand." I then asked him for a bill of sale to the horse, which he gave me, saying that the horse was all right.

H. M. Scott testified, for the State, as follows: I was at Watson's wagon yard, in St. Joe, Montague County, in the early part of November, 1892, and saw the defendant there with a horse, which he proposed to sell; talked with the defendant about the horse, and was by him told that he had the horse under an order from Marsh Freese, in the Cooke County jail, to old man Freese at Fort Worth. I tried to trade for the horse, but

I could not trade with defendant. Jack Watson bought the horse, and I immediately traded with Watson for him. I traded for the saddle that defendant was riding. Got it from Watson. W. C. Freese claimed it, and took it away from me afterward. St. Joe is about twenty-five miles northwest from Gainesville.

—— Blevins testified, for the State, as follows: I have known the defendant for seven or eight years. I saw him at Jack Watson's wagon yard in the early part of November, 1892. He had a horse that he was trying to sell. He told me that Marsh Freese, who was confined in the Cooke County jail, gave him the horse to carry some news to some one in Fort Worth. Marsh Freese used to have a saddle like the one that the defendant had there.

J. T. Shell testified, in his own behalf, as follows: I was confined in the Cooke County jail the latter part of October, 1892. The grand jury failing to indict me, I was released about the 1st of November, 1892. While in jail I made a contract with Marsh Freese by which I was to go to Fort Worth to see Marsh Freese's father and get a horse, and tell Mr. Freese that Marsh Freese wanted to get out of jail, and tell him to take the tools to Marsh's lawyer in Gainesville, Texas. Marsh Freese said his lawyer's name was Green. I was to take the horse and put it in a pasture about three miles from Gainesville, and if he failed to make his escape the horse was to be mine. Marsh Freese described two horses to me, one of which I was to get. One was a horse called Old Bob, and the other a sorrel horse called the heart horse, which was the horse I got. Under that contract, I came down to Fort Worth and met W. C. Freese on Weatherford Street. I had never seen him before, but recognized him as soon as I saw him from the description that Marsh Freese had given me of him while in jail. I asked him if he was not Marsh Freese's father, and he said he was. I then told him that Marsh Freese wanted him to send some tools to aid him in getting out of the Cooke County jail, and told him all that Marsh Freese had sent me to tell him. I told him that Marsh wanted the tools sent to his lawyer, Green, at Gainesville; that he wanted some saws to cut out of jail with, and a six shooter. W. C. Freese then said to me, "Before we talk about these things we had better get a room." We then went to the house of W. C. Freese. The next day we went out to Arlington Heights, it being on Sunday, and spent the greater part of the day there. W. C. Freese said it would not do for us to be seen around town together, as the officers had caught on to him trying to help his son out of jail, and were watching him. The next day we went up Houston Street in Fort Worth. Mr. Freese went into several saloons and took a drink, and asked me several times to take something with him, which I refused. As we went along Houston Street he showed me two or three hardware stores, and said he did not know whether he could get the tools there or not; that he might have to send

tò St. Louis after them.    We then went to Jim Young's house.    I there learned that Jim and Bob Young were brothers-in-law to W. C. Freese. And then W. C. Freese told me that I was the very one that he wanted to take the tools up to Gainesville; that he noticed that I was sober, and that he would rather trust me than any one that he had had anything to do with; that he had trusted some other parties, and that they had got drunk and spoiled everything.    He also told me that he had sold a tract of land, and stated how much he had got for it.    I don't remember just now how much, but it was a considerable sum.    He said that I could beat him getting the tools, and told me that if I got them and would take them and the six shooter to Green, he would, if I ever got in trouble about it, spend the last cent of money he had for me.    Jim Young then spoke up and said that he was a deputy sheriff, and in the sheriff's office all the time, and if any papers ever came there for me he would know it, and would tell W. C. Freese, and he would notify me.    Freese told me that he would pay me well for taking the tools to Green.

When I first met W. C. Freese, on Weatherford Street, Fort Worth, I told him that Marsh had told me to tell him to let me have his saddle and a horse called Old Bob, and if he could not get Old Bob to let me have the heart horse.    W. C. Freese told me that the Hargrove boys had Old Bob, and he would have to let me have the heart horse.    W. C. Freese told me that if Marsh got out that he would pay me well, but did not name the sum he would give me; and that if Marsh did not get out the horse would pay me well for my services; and told me that if it ever came in the way he would like to get the saddle back to remember Marsh by; and just before I started, he took me into the north room of his house, and told me that he would give me a bill of sale to the horse, but that it was Marsh's horse, and he did not know whether it was straight property or not.    W. C. Freese then gave me a $5 bill and $5 in change, saying that that would do to eat on during the trip to Gainesville.    He and I went around to two or three hardware stores on Houston Street looking for the tools, but did not find what we wanted.    At last we saw a breast drill in a show window, and Mr. Freese said that he thought it would be the proper thing to send to Marsh, and gave me some money and told me to go in and price it.    He then went on. I went in and looked at it, but did not think it would do, and after looking around some further I went into a pawnbroker's shop on Houston Street and told the pawnbroker what I wanted.    The man told me that he had just what I wanted, but there were several persons in the shop at that time, and he would not show them to me, but told me to come in later, which I did, when he showed two small pieces of saws, one about five and one about seven inches long.    He told me that he would sell them for $3.50, cautioned me to say nothing about it, and told me that he would buy them back from me when I got through with them.    I paid

him $3.50 for them, took them out near the packing house and hid them in a culvert that was on my road, and I went by and got them when I started. The horse that W. C. Freese let me have was what they called the heart horse. On my way home the horse was very sick at Decatur, and when I got home he was not in a condition to use, and I left him at my father's, borrowed one of his horses, rode him to St. Joe, left him there, took the train, and took the tools which I had gotten in Fort Worth to Green, Marsh Freese's lawyer, in Gainesville. When I went to Green he refused to have anything to do with them. Said there had been so much talking that the whole thing had been given away, and that he was already liable to get into trouble about the matter. I then went to jail, intending to tell Marsh Freese, but could not talk to him privately without a permit, which I did not have, nor no way to get one. I then took the train, returned to St. Joe, got my father's horse, and returned home; had the tools at my father's. Stayed around there several days, and sold the horse to Jack Watson, telling him and every one else that asked me when and from whom I got the horse. If Green would have taken the tools, I would have placed the horse where I agreed to place him; but when he would not, I considered that I had done all and more than I agreed with Marsh Freese to do, and that the horse was mine.

On cross-examination, defendant said: I employed a lawyer when I was first put in jail, but he quit the case soon after. I did not have any lawyer till my case was called for trial, and I did not talk to them much about the case. I did not have any process issued for Green to prove that I carried the tools to him, nor for my father to show that I left the tools there. I did not know that it was necessary to do so. My lawyers nor no one else told me that it was necessary to have my father and Green here at my trial.

On re-examination, defendant said: I never told W. C. Freese that Marsh Freese had already cut out of the Cooke County jail, nor anything of the sort. I told him just what I have said I told him, and no more. I told him what Marsh Freese told me to tell him. A week or ten days after I came the first time to see W. C. Freese I came back and told W. C. Freese what I had done, and what Green said when I took him the tools. He then gave me $22 and begged me to leave the country, and told me he would divide the last dollar with me.

No briefs have come to the hands of the Reporter for the appellant.

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Conviction for theft of a horse. The testimony of the father and mother of appellant is not newly discovered evidence. That part of the charge of the court complained of was not excepted

to at the time.   Was it calculated, when the whole charge and evidence are considered, to injure appellant?  We understand the charge to mean, that if appellant took the horse by permission of the owner (Marsh Freese) with the intent to comply with the agreement made with him, and by doing that which he had promised to do, then he would not be guilty. But that if appellant, when he obtained possession of the horse from the father of the owner, intended to appropriate the horse to his own use at all events, whether he complied with the agreement made with the owner or not, he would be guilty.

Judgment affirmed.

*Affirmed.*

Judges all present and concurring.